**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GRAMERCY FUND MGMT LLC and GRAMERCY PERU HOLDINGS LLC, *Petitioners,* v. THE REPUBLIC OF PERU, *Respondent.* | Case No. 1:23-cv-00684-ABJ <br><br> **Oral Argument Requested** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**RESPONDENT'S MOTION TO DISMISS PETITION TO CONFIRM**
**AND IN OPPOSITION TO PETITIONERS' PETITION TO CONFIRM**

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP
Kevin A. Meehan (D.C. Bar No. 1613059)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 452-7373
Fax: (202) 452-7333
kmeehan@curtis.com

*Attorneys for Respondent*
*The Republic of Peru*

Dated: Washington, D.C.
        April 10, 2024

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 3

    A.   Historical Background of the Bonos ........................................................... 3

    B.   The United States and Peru Enter into the TPA.......................................... 5

    C.   Petitioners Acquire Bonos Decades After the Default................................ 5

    D.   Petitioners Commence the Underlying Arbitration..................................... 6

        1.   The United States' Submission ...................................................... 7

    E.   The Final Award............................................................................................ 9

        1.   The Majority Decision .................................................................... 9

        2.   The Dissent Concludes that the Arbitration Should Have Been Dismissed ............ 11

ARGUMENT .................................................................................................................... 14

    I.   THE PETITION MUST BE DENIED BECAUSE THERE WAS NO AGREEMENT TO ARBITRATE ........................................................... 14

    A.   This Court Must Determine *De Novo* Whether a Valid Arbitration Agreement Exists ....................................................................................... 14

    B.   Peru Did Not Consent to Arbitration......................................................... 16

CONCLUSION................................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Air France v. Saks*,
470 U.S. 392 (1985)..................................................................................................... 16, 17

*Amirmotazedi v. Viacom, Inc.*,
768 F. Supp. 2d 256 (D.D.C. 2011)...................................................................................... 15

*Arizona v. Navajo Nation*,
143 S. Ct. 1804 (2023)...................................................................................................... 17

*BG Grp. plc v. Republic of Arg.*,
572 U.S. 25 (2014)...................................................................................................... 16, 22

*Blasket Renewable Invs. LLC v. Spain*,
No. 23-7038 (D.C. Cir. Feb. 2, 2024).................................................................................. 15

*Blasket Renewable Invs., LLC v. Kingdom of Spain*,
665 F. Supp. 3d 1 (D.D.C. 2023)........................................................................................ 15

*Chevron Corp. v. Republic of Ecuador*,
795 F.3d 200 (D.C. Cir. 2015)...................................................................................... 16, 23

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
760 F. App'x 1 (D.C. Cir. 2019)........................................................................................... 7

*Dist. No. 1 v. Liberty Mar. Corp.*,
998 F.3d 449 (D.C. Cir. 2021)...................................................................................... 14, 16

*Doctor's Assocs. v. Alemayehu*,
934 F.3d 245 (2d Cir. 2019) ............................................................................................... 15

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010)............................................................................................... 14, 15, 16

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019)....................................................................................................... 15

*Howsam v. Dean Witter Reynolds*,
537 U.S. 79 (2002).......................................................................................................... 19

*KenAmerican Res. v. Int'l Union, UMW*,
99 F.3d 1161 (D.C. Cir. 1996)............................................................................................ 15

*LLC SPC Stileks v. Republic of Mold.*,
985 F.3d 871 (D.C. Cir. 2021)...................................................................................... 16, 23

*Medellin v. Texas*,
552 U.S. 491 (2008)......................................................................................................... 22

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)......................................................................................................... 22

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*,
530 U.S. 604 (2000)......................................................................................................... 17

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
    850 F.2d 756 (D.C. Cir. 1988)........................................................... 14, 15, 16

*OI European Group B.V. v. Bolivarian Republic of Venezuela*,
    Civ. No. 16-1533 (ABJ), 2019 U.S. Dist. LEXIS 85128 (D.D.C. May 21, 2019) .................. 23

*Perenco Ecuador Ltd. v. Republic of Ecuador*,
    Civ. No. 1:19-cv-2943 (JMC), 2023 U.S. Dist. LEXIS 44022 (D.D.C. Mar. 16, 2023).......... 23

*Sarhank Grp. v. Oracle Corp.*,
    404 F.3d 657 (2d Cir. 2005) ............................................................ 14

*Schneider v. Kingdom of Thail.*,
    688 F.3d 68 (2d Cir. 2012) ...................................................... 15, 16, 22

*Sullivan v. Kidd*,
    254 U.S. 433 (1921)....................................................................... 17

*Sumitomo Shoji Am., Inc. v. Avagliano*,
    457 U.S. 176 (1982)....................................................................... 17

*Tenaris, S.A. v. Bolivarian Republic of Venezuela*,
    Civ. No. 1:18-cv-01373 (CJN), 2021 U.S. Dist. LEXIS 59126 (D.D.C. Mar. 29, 2021)......... 23

*Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*,
    718 F.3d 448 (5th Cir. 2013) ............................................................ 23

*United Mexican States v. Nelson*,
    No. 22-CV-4047-CJW-KEM, 2023 U.S. Dist. LEXIS 49354 (N.D. Iowa Mar. 23, 2023)........ 7

*United Steelworkers v. Am. Mfg.*,
    363 U.S. 564 (1960)....................................................................... 14

*United Steelworkers v. Enter. Wheel & Car Co.*,
    363 U.S. 593 (1960)....................................................................... 14

*Westinghouse Credit Corp. v. D'Urso*,
    371 F.3d 96 (2d Cir. 2004) .............................................................. 23

*Wright v. Henkel*,
    190 U.S. 40 (1903)....................................................................... 17

**Statutes**

22 U.S.C. § 1650a.......................................................................... 7

28 U.S.C. § 1603(a) ....................................................................... 3

9 U.S.C. § 207.............................................................................. 14

**Foreign Laws**

*Dispute regarding Navigational and Related Rights (Costa Rica v. Nicar.)*,
    Judgment, I.C.J. Rep. 133 (July 13, 2009)............................................. 17

**Other Authorities**

Appellate Body Report, *European Communities – Customs Classification of Certain Computer Equipment*, WTO Doc. WT/DS62-67-68/AB/R (June 5, 1998)............................. 17

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ................................................................. 2, 14

Report on United States-Peru Trade Promotion Agreement Implementation Act, H.R. REP. NO. 110-421 (2007).............................................................................................. 5

United States-Peru Trade Promotion Agreement Peru-U.S., Apr. 12, 2006, 121 Stat. 1455 ......................................................................... passim

Respondent Republic of Peru ("Republic" or "Peru") respectfully submits this memorandum of law in opposition to the petition filed by Petitioners Gramercy Fund Management LLC ("GFM") and Gramercy Peru Holdings LLC ("GPH") (the "Petition") to confirm the award rendered in *Gramercy Funds Management LLC v. Republic of Peru*, ICSID Case No. UNCT/18/2 (Dec. 6, 2022) (the "Award").

## PRELIMINARY STATEMENT

This case involves an ancient dispute that traces its roots back over half a century. In 1969, Peru enacted certain land reforms resulting in the expropriation of land held by Peruvian nationals. As part of their compensation for the expropriation of their land, the Peruvian landowners received "Bonos," securities that were issued in the 1970s that entitled the landowners to annual payments in domestic Peruvian currency. However, by the 1980s the Bonos were rendered worthless as a result of hyperinflation and devaluation of the Peruvian currency. The Bonos entered default in 1987, and, in the decades since, the Bonos have been the subject of numerous litigations in the Peruvian courts, and the Peruvian government has made numerous attempts to resolve the dispute over how to make payment on the Bonos.

Petitioners entered the picture in 2006. Just weeks after the United States and Peru announced that they would be signing the United States-Peru Trade Promotion Agreement, Peru-U.S., Apr. 12, 2006, 121 Stat. 1455 ("TPA"), Gramercy prepared an internal memorandum laying out a strategy for acquiring the long-defaulted and worthless Bonos. Five days after the United States and Peru signed the TPA, Petitioner GPH was incorporated and thereafter began acquiring Bonos from Peruvian nationals. Petitioners ultimately commenced an arbitration pursuant to the TPA seeking damages of $1.8 billion for non-payment of the Bonos. A Majority of the Tribunal awarded Petitioners a fraction of that amount. The third member of the Tribunal issued a powerful dissent arguing that the arbitration was an abuse of the international arbitration

process and should have been dismissed.  The Dissent further concluded that the Tribunal did not have jurisdiction to entertain the arbitration.

Petitioners now seek to enforce the Award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention").  However, this Court should deny the Petition and refuse to enforce the Award pursuant to Article V of the Convention because there was no agreement to arbitrate between the parties.

As an initial matter, this Court must decide for itself whether the parties formed an agreement to arbitrate.  It is well established that courts must always decide questions concerning the formation of a valid arbitration agreement and such questions cannot be delegated to the arbitrators.  Thus, the Majority's rulings on jurisdiction are not entitled to any deference.

As the United States government explained in its submission in the underlying arbitration, an agreement to arbitrate is only formed where both the investor and State consent to arbitration in accordance with the terms of the TPA.  The United States and Peru carefully negotiated and agreed upon substantive requirements and limitations on their consent to arbitration, which are set forth in Articles 10.16 through 10.18 of the TPA.  The United States and Peru share a common understanding that they cannot be deemed to have consented to arbitrate unless the requirements and limitations in Articles 10.16 through 10.18 of the TPA are satisfied.

Here, Petitioners cannot satisfy the requirements of Article 10.18(1), which provides that the United States and Peru do not consent to arbitrate claims brought more than three years after the investor knew, or should have known, of both an alleged breach of the TPA and a loss resulting therefrom.  The Bonos have been in default since 1987, and it is undisputed that the

- 2 -

Bonos have been worthless ever since.  The claims are thus based on events that occurred and injuries that were sustained decades before Petitioners commenced the arbitration in 2016 and decades before the TPA entered into force in 2009.  As the United States explained in the arbitration, the three-year period under Article 10.18(1) is rigid and cannot be extended based on subsequent acts that may occur as a part of a continuing course of conduct.  Thus, the Peruvian government's continued actions to address the payment of the Bonos in the decades following the default in 1987 are irrelevant under Article 10.18(1).  Furthermore, none of the subsequent actions of the Peruvian government caused any loss distinct from the loss suffered as a result of the 1987 default.  Indeed, it is undisputed that the Bonos have been worthless since 1987.  Accordingly, the express requirements and limitations on Peru's consent to arbitrate are not satisfied and therefore no agreement to arbitrate was ever formed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      Historical Background of the Bonos

Respondent Peru is a foreign state as defined in 28 U.S.C. § 1603(a).  In 1969, Peru enacted an agrarian land reform law pursuant to which Peru exercised eminent domain over parcels of land in Peru.  Award ¶¶ 116-17.  This law provided that landowners would receive a substantial portion of their compensation in the form of "Bonos" – paper securities issued by Peru that provided landowners with a right to annual payments comprising part of the principal amount of the value of the land plus interest.  *Id.* ¶¶ 114, 117.  The Bonos were payable in domestic Peruvian currency, subject to Peruvian law and provided holders with the right to recourse in Peruvian courts.  *Id.* ¶ 149.  The Bonos were issued in Peru to expropriated Peruvian landowners and were not marketed to investors.  *Id.* ¶¶ 117, 160; Dissent ¶ 86.  The Bonos were

issued by Peru in the 1970s.  Dissent ¶ 86.  The Bonos had maturities of between 20 to 30 years and accrued interest at rates between 4% to 6% depending on their maturity.  Award ¶ 174.

By the 1980s, the Bonos were already in default and worthless as a result of inflation in the Peruvian economy and the devaluation of the Peruvian currency.  Award ¶¶ 120-21.  In fact, bondholders stopped requesting payment on the Bonos.  *Id.* ¶ 121.  A default was declared in 1987, and the paying agent for the Bonos was extinguished in 1992.  *Id.* ¶ 122; Dissent ¶ 36.

Following the default on the Bonos, disputes arose with the Peruvian landowners  who received the Bonos as compensation for the expropriation of their land, and the Peruvian government made numerous attempts to resolve those disputes.  In 1991, Peru's President issued a decree providing for the expropriated landowners to receive cash payments based on the market value of the expropriated property (the "1991 Decree").  Award ¶ 123.  In 1996, Peru's legislature enacted a law abrogating that decree and providing for the outstanding Bonos to paid at face value.  *Id.*  That legislation was challenged in the Peruvian courts and was held unconstitutional by Peru's highest court in 2001 (the "2001 Decision").  *Id.* ¶¶ 124-25.  Between 2001 and 2011, Peru's legislature considered at least nine different draft bills to address payment of the Bonos  – none of which were enacted into law.  *Id.* ¶¶ 130, 133.

During this period, no payments were made on the Bonos, and Peruvian bondholders continued to press legal claims in the Peruvian courts to receive compensation.  In July 2013, Peru's highest court issued a decision (the "2013 Decision"), by majority, holding that the Bonos should be revalued applying a dollarization method and ordering Peru's Ministry of Economy and Finance (the "MEF") to issue decrees providing procedures for revaluation of the Bonos, for bondholders to register their Bonos, and for payment of the underlying debt.  Award ¶ 138.  In 2014, the MEF issued decrees implementing the 2013 Decision and establishing a formula for

revaluing the Bonos (the "2014 Decrees").  *Id.* ¶¶ 791-93.  In 2017, Peru issued a new decree that established new formulas for revaluing the Bonos and provided detailed procedures for obtaining payment on the outstanding Bonos (the "2017 Decrees").  *Id.* ¶¶ 800, 803.

### B.    The United States and Peru Enter into the TPA

Meanwhile, the United States and Peru began negotiation of the TPA in May 2004.  Report on United States-Peru Trade Promotion Agreement Implementation Act, H.R. REP. NO. 110-421, at 7 (2007).  On January 6, 2006, the U.S. Trade Representative formally notified the U.S. Congress of its intention to enter into the TPA with Peru.  *Id.*  The United States and Peru signed the TPA on April 12, 2006, and the TPA entered into force on February 1, 2009.  Award ¶ 1.  Among other things, the TPA provides certain protections to qualified investors.  TPA, Ch. 10 § A.  However, the TPA expressly states that its investment provisions "do[] not bind any Party in relation to any act or fact that took place … before the date of entry into force of this Agreement" (i.e. February 1, 2009).  TPA, art. 10.1(3).  The TPA also contains provisions on the settlement of investment disputes with qualified investors and sets forth, in detail, the substantive requirements and limitations on the United States and Peru's consent to arbitrate disputes with qualifying investors of the other State.  TPA, arts. 10.16-10.18.

### C.    Petitioners Acquire Bonos Decades After the Default

Gramercy is a so-called "vulture fund" that was founded in 1998 and seeks to "exploit distressed opportunities in emerging markets."  Dissent ¶ 62.  No Bonos were issued to Petitioners, and Petitioners had no involvement in the underlying expropriations.  Indeed, Gramercy was founded decades after the Bonos were issued and years after the Bonos were rendered worthless.  It only entered the picture years later in 2006.

Shortly after the U.S. Trade Representative formally announced the United States' intention to sign the TPA, Gramercy began planning to acquire Bonos from Peruvian nationals. Gramercy prepared an internal memorandum analyzing the situation concerning the Bonos, dated January 24, 2006 (the "2006 Memorandum").  Dissent ¶ 9.  It recognized that the Bonos had been "in default for a period of 18 years" and were "worthless."  *Id.* (quoting the 2006 Memorandum).  It further recognized that Peruvians had been pursuing legal actions in Peruvian courts to demand payment on the Bonos.  *Id.*

On April 17, 2006 – just five days after the United States and Peru signed the TPA – Gramercy incorporated Petitioner GPH in Delaware.  Award ¶ 575.  Between 2006 and 2008, GPH acquired 9,656 Bonos from local Peruvian individuals in exchange for approximately $33.2 million.  *Id.* ¶¶ 135-36.  Gramercy then engaged in a lobbying and public relations campaign to pressure Peru to make payment on the Bonos.  *See id.* ¶¶ 438, 440; Dissent ¶¶ 42, 64.[1]

**D.    Petitioners Commence the Underlying Arbitration**

On February 1, 2016, Petitioners served Peru with a notice of arbitration pursuant to the TPA.  Award ¶ 6.  Petitioners claimed to be investors under the TPA by virtue of their acquisition of the Bonos and thus entitled to invoke arbitration under UNCITRAL rule pursuant to Article 10.16(3)(c) of the TPA.  Pet. ¶ 19.  However, the TPA expressly contains various limitations on the consent of the United States and Peru to arbitration of investment claims.  In particular, the TPA provides that the United States and Peru do not consent to arbitrate claims "if more than three years have elapsed from the date on which the claimant first acquired, or should

---

[1] Gramercy acquired another tranche of Bonos in 2017, after the commencement of the arbitration.  Award ¶ 82; Dissent ¶ 3.

have acquired, knowledge of the breach alleged … and knowledge that the claimant … has incurred loss or damage."  TPA, art. 10.18(1).

Petitioners primarily asserted that Peru breached the TPA's Minimum Standard of Treatment provision, which states: "Each Party shall accord to covered investments treatment in accordance with customary international law, including fair and equitable treatment and full protection and security."  TPA, art. 10.5(1).  This provision further states that it "prescribes the customary international law minimum standard of treatment of aliens as the minimum standard of treatment to be afforded to covered investments."  TPA, art. 10.5(2).  While the Bonos had been in default since at least 1987 and the payment of the Bonos were the subject of numerous decrees and judicial decisions in the years before the TPA entered into force in 2009, Petitioners nevertheless argued that the 2014 and 2017 Decrees were arbitrary and thus failed to provide the minimum standard of treatment under Article 10.5 of the TPA.  Award ¶¶ 122-42, 781.  Petitioners sought damages of $1.8 billion.  *Id.* ¶ 1307.

While the arbitration was administered by the International Centre for Settlement of Investment Disputes ("ICSID"), the arbitration was not conducted under the ICSID Convention or the ICSID Rules.[2]  The arbitration was seated in Paris.  Pet. ¶¶ 19-20.

### 1.   The United States' Submission

The United States government, as a party to the TPA, submitted a non-disputing party brief in the underlying arbitration outlining the United States' position on the proper

---

[2]  Accordingly, the Award is not governed by 22 U.S.C. § 1650a, the statute implementing the ICSID Convention.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 760 F. App'x 1, 2-3 (D.C. Cir. 2019); *United Mexican States v. Nelson*, No. 22-CV-4047-CJW-KEM, 2023 U.S. Dist. LEXIS 49354, at *7 (N.D. Iowa Mar. 23, 2023).

interpretation of the TPA (the "U.S. Submission").[3]

The U.S. explained that an agreement to arbitrate is only formed where both the investor and the State consent to arbitration in accordance with the terms of the TPA.  *See* U.S. Submission ¶ 3.  It explained that the U.S. and Peru have only consented to arbitrate investor-State disputes where the express requirements and limitations set forth in Articles 10.16-18 are satisfied.  *Id.*  Where those requirements are not satisfied, the State Party has not consented to arbitration and thus the tribunal would have no jurisdiction.  *Id.* ¶¶ 2-3.

The U.S. explained that Article 10.18(1) of the TPA contains an explicit limitation on a State Party's consent to arbitration.  *Id.* ¶ 5.  That Article provides that the United States and Peru do not consent to arbitration where more than three years have elapsed from the date that the claimant knew or should have known of the alleged breach of the TPA and the resulting injury or loss to the claimant.  *Id.* ¶ 4 (quoting Article 10.18(1)).  The U.S. explained that the three-year "period is a clear and rigid requirement that is not subject to any suspension, prolongation, or other qualification."  *Id.* ¶ 6 (internal quotation marks omitted).  It further explained that "a continuing course of conduct does not extend the limitations period under Article 10.18.1."  *Id.* ¶ 6 n.11.  Thus, "subsequent transgressions by a Party arising from a continuing course of conduct do not renew the limitations period …."  *Id.* ¶ 6.  The U.S. explained that the claimant has the burden of proving that its claim falls within the three-year period under Article 10.18.  *Id.* ¶ 5.  If the claimant fails to satisfy this burden, the State Party cannot be deemed to have consented to arbitration under the TPA and the tribunal would lack jurisdiction.  *Id.*

---

[3] A copy of the U.S. Submission is appended as Exhibit 1 to the Declaration of Kevin Meehan, dated April 10, 2024.

The U.S. further explained that the TPA's arbitration provision – Article 10.16(1) – contains a causation requirement. *Id.* ¶¶ 58-59. That Article provides for arbitration of investor-State disputes where, *inter alia*, "the claimant has incurred loss or damage by reason of, or arising out of" the State's breach. TPA, art. 10.16(1)(a)(ii). The U.S. explained that this language requires a causal nexus between the alleged breach and the claimant's alleged injury. U.S. Submission ¶ 59. The causation standard requires that the alleged breach constitute both the "but for" and proximate cause of the claimant's alleged injury. *Id.* ¶¶ 59-60. The U.S. cautioned that the proximate causation standard should be carefully applied to ensure that tribunals do not award compensation that could "be construed as intending to deter or punish the conduct of the disputing State," which would violate the express prohibition on the award of punitive damages under Article 10.26(4) of the TPA. *Id.* ¶ 61.

### E.      The Final Award

On December 22, 2022, the Majority of the Tribunal issued the Award. One of the arbitrators, Prof. Brigitte Stern, issued a dissenting opinion concluding that the arbitration should have been dismissed.

#### 1.      The Majority Decision

The Majority of the Tribunal concluded that it had jurisdiction over the arbitration. While the Majority recognized that the TPA explicitly states that it does not apply with respect to State acts that occurred prior to the TPA's entry into force (i.e. February 1, 2009), it concluded that Petitioners' claims were based on the 2013 Decision and the 2014 and 2017 Decrees and not the underlying default or any of the other many State actions that occurred between the 1980s and 2009. Award ¶¶ 337, 344. The Majority reasoned that the subject matter of Petitioners' dispute with Peru was "entirely different" from the "historic dispute" over payment of the Bonos.

*Id.* ¶ 386.  It explained that there was "a gap of more than two decades" between the default in 1987 and the 2013 Decision and subsequent Decrees.  *Id.* ¶ 387.  It also explained that the "historic dispute" concerned the proper valuation of the Bonos and was a matter of purely domestic law.  *Id.* ¶¶ 388, 390.  It viewed Petitioners' claims as raising "a totally separate investment dispute" as to whether Peru had created an arbitrary and unjust regime for valuing and paying the Bonos, and that Petitioners' claims were governed by the TPA and international law.  *Id.* ¶ 391.  The Majority further determined that the requirements of Article 10.18(1) of the TPA were satisfied because Petitioners' claims were based on the 2013 Decision and the 2014 and 2017 Decrees, which were issued no more than three years prior to Petitioners' commencement of the arbitration in 2016.  *Id.* ¶¶ 536-37.  Even though the Majority acknowledged that the Bonos were subject to a "historical dispute" and considerable litigation in Peruvian courts, it concluded that Petitioners' claims were not abusive, in part, because Petitioners' investments were not burdened by pre-existing litigation.  *Id.* ¶¶ 403-04.

On the merits, the Majority concluded that the 2013 Decision and the 2014 and 2017 Decrees violated the Minimum Standard of Treatment provision in Article 10.5 on the grounds that certain aspects of the Decrees were arbitrary and departed from the standards set forth in the 2013 Decision.  Award ¶ 986.  The Majority dismissed all of Petitioners' other claims.  *Id.* ¶ 1396.  The Majority awarded Petitioners the amount they paid to acquire the Bonos, $33,222,630, plus compound interest of 7.22% per annum accruing from January 1, 2009.  *Id.* ¶ 1339.  That amounts to approximately $50 million in pre-award interest alone.  In addition, the Majority ordered Peru to pay over $10.5 million to reimburse Petitioners for legal fees and arbitration costs.  *Id.* ¶ 1396(v).

### 2.     The Dissent Concludes that the Arbitration Should Have Been Dismissed

Prof. Brigitte Stern issued a powerful dissenting opinion stating that the Majority's Award is "utterly wrong both in law and in justice."  Dissent ¶ 1.  The Dissent concluded that, as a matter of justice, the Majority's decision to award Petitioners windfall profits was inequitable given Petitioners' "disregard of the internal process created by Peru to compensate the bondholder" as well as the inequity of allowing Petitioners to recover more than Peruvians could recover on the Bonos.  *Id.* ¶ 3.  It further concluded that, as a matter of law, the Tribunal did not have jurisdiction and that Petitioners' claims were inadmissible on the grounds that the arbitration was an abuse of process.  *Id.* ¶¶ 2, 11.  While the Dissent's conclusions were based on the totality of the record, the Dissent identified five bases for concluding that the arbitration constituted an abuse of process.  *Id.* ¶ 5.

First, it is well established under international investment law that a claim based on the acquisition of an asset that was already mired in a pre-existing dispute is inadmissible as an abuse of the international arbitration process.  Dissent ¶ 11.  While both the Dissent and the Majority acknowledged this well-established principle, the Dissent explained that the Majority elided this principle by concluding, against all the evidence on record, that there was no dispute concerning the Bonos when Petitioners acquired them in 2008 and 2009.  *Id.* ¶ 10.  In reality the Bonos had been mired in disputes since the default in the 1980s – decades before Petitioners acquired any Bonos.  *Id.* ¶ 8.  Gramercy acknowledged these disputes in the 2006 Memorandum, which stated that the Bonos had been in default for years and were worthless and that Peruvians had been fighting with Peru over the Bonos in Peruvian courts.  *Id.* ¶ 9.  While the Dissent concluded that there was no need to demonstrate the existence of a pre-existing litigation to show a pre-existing dispute, Gramercy's own C.E.O. testified at the hearing that Petitioners had

- 11 -

acquired Bonos from Peruvians who were already embroiled in litigation concerning the Bonos and that Petitioners took over those existing litigations after acquiring the Bonos. *Id.* ¶¶ 13-17.

Second, the Dissent concluded that the pre-existing dispute concerning the payment of the Bonos well pre-dated the TPA's entry into force on February 1, 2009 and that no new dispute arose thereafter. Dissent ¶ 35. It rejected the Majority's belief that the 2013 Decision and the 2014 and 2017 Decrees gave rise to new disputes that differed from the pre-existing historical dispute concerning the payment of the Bonos. *Id.* ¶¶ 29-30. It explained that the dispute over the payment of the Bonos arose out of the default in 1987 and continued thereafter as a consistent practice of non-payment. *Id.* ¶¶ 33-34.

Third, the Dissent concluded that the damage resulting from the dispute occurred before Petitioners acquired any Bonos. Dissent ¶¶ 36, 41. In the Dissent's view, the damage claimed was the non-payment of the Bonos and that damage was sustained when the Bonos entered default in 1987. *Id.* ¶ 36. The Dissent explained that it was undisputed that the Bonos were worthless following the default and thus had no value when Petitioners acquired them. *Id.* ¶ 37. Before acquiring any Bonos, Petitioners acknowledged in their 2006 Memorandum that the Bonos were worthless. *Id.* ¶ 38. Gramercy's C.E.O. also testified during the arbitration that the Bonos were worthless before Petitioners acquired them. *Id.* ¶ 39. The Majority likewise acknowledged that the Bonos had been worthless since the 1980s. *Id.* ¶ 40. The Dissent concluded that Petitioners had only acquired the Bonos as part of a plan to assert legal and lobbying pressure on Peru to resuscitate the dead Bonos. *Id.* ¶ 42.

Fourth, it is well established under international investment law that an abuse of process arises where an investment is made or restructured for the purposes of bringing a treaty claim over what had been a purely domestic dispute. Dissent ¶¶ 11-12. The Dissent concluded that

Petitioners' claims violated this principle and were therefore inadmissible.  It found that Petitioners were, in reality, purchasing existing domestic claims against Peru from Peruvian nationals in respect of the Bonos with the aim of bringing claims under the TPA.  *Id.* ¶¶ 43-45.  It pointed out that GPH was incorporated just five days after the TPA was signed, and that GPH acquired its first Bonos just a couple of months later.  *Id.* ¶¶ 47-49.  The Dissent also viewed Petitioners' demand for windfall compensation of $1.8 billion plus compound interest of 7.22% demonstrative of bad faith given the comparatively nominal price Petitioners paid for the Bonos. *Id.* ¶¶ 50-54.

Fifth, the Dissent concluded that Petitioners had no intention of developing any economic activity in Peru and thus its invocation of the TPA was abusive.  Dissent ¶ 56.  It rejected the notion that Petitioners' token payments to Peruvian bondholders constituted a contribution to the Peruvian economy because Petitioners made those payments with the ultimate goal of extracting a windfall payment of $1.8 billion plus interest from the Peruvian government – which would have severe impacts on the Peruvian economy.  *Id.* ¶ 97.  The Dissent further explained that this finding also leads to the conclusion that Petitioners had not made an "investment" in Peru as defined under the TPA.  *Id.* ¶ 56.  It explained that, while the TPA included bonds as an example of the type of asset that may qualify as an investment, the TPA expressly provides that public debt only constitutes an investment where it possesses the defined characteristics of an investment.  *Id.* ¶¶ 71-74.  Among the characteristics of an investment required under the TPA is an element of risk, and the Dissent explained that this requires a contribution to an economic venture and the existence of a specific operational risk.  *Id.* ¶ 83.  It held that the Bonos had no connection to any operations in Peru and thus had no operational risk.  *Id.* ¶¶ 84-95.

## ARGUMENT

## I.   THE PETITION MUST BE DENIED BECAUSE THERE WAS NO AGREEMENT TO ARBITRATE

The Petition seeks confirmation of the Award pursuant to the New York Convention as implemented under the Federal Arbitration Act, 9 U.S.C. § 207.  The Convention only applies where non-domestic arbitral awards were rendered pursuant to an arbitration agreement between the parties.  *See* New York Convention, art. II.  Courts may therefore refuse to enforce an arbitral award where there is no valid arbitration agreement between the parties.  *See id.*, art. V; *see also Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005) (holding that courts may refuse to enforce an award under Article V of the Convention where there was no arbitration agreement between the parties).  Indeed, an "award is legitimate only so long as it draws its essence from the … [arbitration] agreement."  *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 597 (1960); *see also United Steelworkers v. Am. Mfg.*, 363 U.S. 564, 570 (1960) (Brennan, J., concurring) ("Arbitration is a creature of contract").

### A.   This Court Must Determine *De Novo* Whether a Valid Arbitration Agreement Exists

The existence of an agreement to arbitrate is a threshold question that U.S. courts must decide *de novo* and without deference to the tribunal's decisions.  *See, e.g.*, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-301 (2010).  It is a well-established principle that questions concerning formation of the arbitration agreement "must always be decided by the courts."  *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988); *see also Dist. No. 1 v. Liberty Mar. Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021) ("Insofar as the threshold question whether a valid arbitration agreement exists then is necessarily for the court to determine, such that it cannot be delegated to an arbitrator") (internal citations omitted)

(quoting *Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 530 (2019)).  This is

because "if there was never an agreement to arbitrate, there is no authority to require a party to

submit to arbitration."  *Nat'l R.R. Passenger Corp.*, 850 F.2d at 761 (internal quotations

omitted); *see also Blasket Renewable Invs., LLC v. Kingdom of Spain*, 665 F. Supp. 3d 1, 10

(D.D.C. 2023) (holding that deferring to tribunal on whether a valid arbitration agreement exists

would "effectively assume[] away th[at] antecedent question").[4]  Accordingly, a reviewing court

"may not afford any deference at all to the arbitrator's view" as to the existence of an arbitration

agreement.  *See KenAmerican Res. v. Int'l Union, UMW*, 99 F.3d 1161, 1163 (D.C. Cir. 1996);

*see also Granite Rock*, 561 U.S. at 299-301; *Doctor's Assocs. v. Alemayehu*, 934 F.3d 245, 251

(2d Cir. 2019) ("[P]arties may not delegate to the arbitrator the fundamental question of whether

they formed the agreement to arbitrate in the first place."); *Amirmotazedi v. Viacom, Inc*., 768 F.

Supp. 2d 256, 263 (D.D.C. 2011) (denying motion to compel arbitration because mental capacity

defense went to the "formation" or "making" of the arbitration agreement, and therefore had to

be decided by the court).

Petitioners cite *Schneider v. Kingdom of Thail.*, 688 F.3d 68, 71-73 (2d Cir. 2012), which

holds that (a) questions of arbitrability are presumptively reviewed *de novo* by courts absent

clear and unmistakable evidence that the parties agreed to delegate issues of arbitrability to the

arbitrators and (b) the parties' agreement to arbitrate under UNCITRAL rules constitutes clear

and unmistakable evidence of delegation such that courts must give deference to the tribunal's

---

[4] The U.S. government recently submitted an amicus brief in the pending appeal in *Blasket* taking the position that courts must independently determine whether an agreement to arbitrate exists as a threshold matter even where the underlying arbitration was brought under UNCITRAL rules pursuant to an investment treaty.  *See* Brief for the United States as Amicus Curiae, at 10, 13-16, *Blasket Renewable Invs. LLC v. Spain*, No. 23-7038 (D.C. Cir. Feb. 2, 2024).

rulings on the scope of the arbitration agreement.  However, the Second Circuit in *Schneider*

carefully distinguished between questions of arbitrability that concern the formation of an

agreement to arbitrate and questions concerning the scope of an existing arbitration agreement.

*Id.* at 71-72.  Only questions concerning the scope of the arbitration agreement may be delegated

to the arbitrators.  The threshold question of whether a valid arbitration agreement exists must

always be decided *de novo* by the courts and cannot be delegated to the arbitrators.  *See Granite*

*Rock*, 561 U.S. at 299-301; *Liberty Mar. Corp.*, 998 F.3d at 457; *Nat'l R.R. Passenger*, 850 F.2d

at 761.[5]

### B.     Peru Did Not Consent to Arbitration

Petitioners assert that the parties' agreement to arbitrate is found in Chapter 10 of the

TPA.  Pet. ¶ 27.  This Court must therefore turn to the text of the TPA to determine for itself

whether an agreement to arbitrate was formed in accordance with the terms of that treaty.  It is

well established that the interpretation of a treaty, like any other contract, is a matter of

determining the parties' intent.  *See BG Grp. plc v. Republic of Arg.*, 572 U.S. 25, 37 (2014); *Air*

*France v. Saks*, 470 U.S. 392, 399 (1985) (courts must give "the specific words of the treaty a

meaning consistent with the shared expectations of the contracting parties"); *Wright v. Henkel*,

---

[5] The D.C. Circuit has also held that an agreement to arbitrate under UNCITRAL rules may
constitute clear and unmistakable evidence that the parties intended to delegate to the arbitrators
questions concerning the scope of an arbitration agreement (such as whether an investor made a
qualifying investment under a bilateral investment treaty).  *See LLC SPC Stileks v. Republic of*
*Mold.*, 985 F.3d 871 (D.C. Cir. 2021); *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200
(D.C. Cir. 2015).  However, the D.C. Circuit likewise recognizes the distinction between
questions concerning the formation of an arbitration agreement and questions concerning the
scope of an agreement – and that only questions of scope may be delegated to the arbitrators.
*See Stileks*, 985 F.3d at 879 ("Here, however, the question that receives *de novo* review is
whether the arbitrability decision was delegated to the arbitrators"); *see also Liberty Mar. Corp.*,
998 F.3d at 457; *Nat'l R.R. Passenger*, 850 F.2d at 761.

190 U.S. 40, 57 (1903) ("Treaties must receive a fair interpretation, according to the intention of the contracting parties."); *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1825 (2023) ("courts must look to the 'shared expectations of the contracting parties,'" with "an eye to ensuring both sides receive the 'benefit of their bargain'") (quoting *Air France*, 470 U.S. at 399 and *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 621 (2000)); *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921) ("[T]reaties are to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals, and are to be executed in the utmost good faith, with a view to making effective the purposes of the high contracting parties[.]").[6]

Here, it is easy to determine the parties' intent and understanding of the TPA because the U.S. Submission in the underlying arbitration confirms that the United States and Peru share the same basic understanding of the relevant terms of the TPA's dispute resolution clauses.  Because both parties to the TPA – i.e. Peru and the United States – have a common understanding of the relevant terms of the Treaty, this Court should defer to the State parties' shared interpretation of those terms.  *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982) (holding that "when the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong

---

[6] This basic principle of treaty interpretation is also well established in international law.  *See, e.g.*, *Dispute regarding Navigational and Related Rights (Costa Rica v. Nicar.)*, Judgment, I.C.J. Rep. 133, ¶ 63 (July 13, 2009) ("[T]he terms used in a treaty must be interpreted in light of what is determined to have been the parties' common intention."); Appellate Body Report, *European Communities – Customs Classification of Certain Computer Equipment*, ¶ 84, WTO Doc. WT/DS62-67-68/AB/R (June 5, 1998) ("The purpose of treaty interpretation under Article 31 of the Vienna Convention is to ascertain the common intentions of the parties.").

contrary evidence, defer to that interpretation.").  That shared interpretation of the TPA confirms that no agreement to arbitrate was ever formed between Peru and Petitioners.

As explained in the U.S. Submission, an agreement to arbitrate is only formed pursuant to the TPA where both the investor and State consent to arbitration in accordance with the terms of that treaty.  *See* U.S. Submission ¶ 3.  In particular, the U.S. and Peru have only consented to arbitrate investor-State disputes where the express requirements and limitations on their consent set forth in Articles 10.16-18 of the TPA are satisfied.  *Id.* ¶¶ 3, 5.  It is the investor who bears the burden of satisfying those requirements and limitations.  *Id.* ¶ 5.  If any of those requirements or limitations are not satisfied, the State Party has not consented to arbitration and thus no agreement to arbitrate is formed.  *Id.* ¶¶ 2-3.  Here, Petitioners failed to satisfy those express requirements and limitations on the consent to arbitration, and therefore no agreement to arbitrate was ever formed with Peru.

Petitioners cannot satisfy the "Conditions and Limitations on Consent of Each Party" as set forth in Article 10.18 of the TPA.  In particular, Article 10.18(1) of the TPA expressly limits Peru's consent to arbitration to claims brought no more than three years after the investor knew, or should have known, of both an alleged breach of the TPA and a resulting loss or damage.  TPA, art. 10.18(1).  As the U.S. Submission explains, Article 10.18(1) of the TPA provides an explicit limitation on any consent to arbitration such that neither Peru nor the United States can be deemed to have consented to arbitrate any claims falling outside the three-year period under Article 10.18(1).  *See* U.S. Submission ¶ 5.

Here, Petitioners cannot satisfy Article 10.18(1).  It is undisputed that Peru defaulted on the Bonos in 1987 and that the Bonos were rendered worthless in the 1980s.  In other words, the predicate default and resulting injury occurred nearly 30 years prior to the commencement of the

arbitration in 2016.  It is further undisputed that Petitioners were well aware of these facts nearly a decade prior to commencing the arbitration.  Indeed, Petitioners' 2006 Memorandum acknowledged that Peru defaulted on the Bonos in 1987 and that the Bonos were worthless.  Dissent ¶ 9 (quoting the 2006 Memorandum).  Peru clearly did not consent to arbitrate claims arising out of a decades-old default on bonds that have been worthless since the 1980s.  Indeed, the plain terms of Article 10.18(1) make clear that neither the United States nor Peru made an offer to arbitrate claims relating to actions and injuries that occurred decades ago.  That conclusion is further confirmed by the fact that the United States and Peru expressly agreed that Chapter 10 of the TPA "does not bind any Party in relation to any act or fact that took place … before the date of entry into force of this Agreement" (i.e. February 1, 2009).  TPA, art. 10.1(3).  Thus, the plain language of the TPA confirms that the United States and Peru did not consent to arbitrate long-simmering disputes from the 1980s.[7]

Petitioners argued (and the Majority of the Tribunal accepted) that their claims were based on the 2013 Decision and the 2014 and 2017 Decrees and not the underlying default.  Award ¶¶ 344, 536.  But that argument cannot be squared with the common understanding of

---

[7] The Supreme Court has held that questions concerning "time limits" may be questions of procedure to be decided by the arbitrators as opposed to questions of arbitrability to be decided by the court.  *See Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002).  However, the existence of an arbitration agreement was undisputed in *Howsam*.  *See id.* at 81.  Rather, the parties agreed to an institutional arbitration under NASD rules – and those institutional rules (not the parties' agreement) contained a statute of limitations.  *See id.* at 82.  *Howsam* held that this provision in the NASD rules presented a procedural question to be decided by NASD arbitrators and not a question of arbitrability.  *Id.* at 85.  Here, by contrast, Article 10.18(1) contains an explicit limitation on the State Party's consent to arbitration, and both the United States and Peru agree that they do not consent to arbitration where the requirements of Article 10.18(1) have not been met.  *See* U.S. Submission ¶¶ 5, 6.  Thus, unlike the NASD rules in *Howsam*, Article 10.18(1) of the TPA is not a procedural issue but rather a substantive requirement that goes to the parties' consent to arbitration.

Peru and the United States that the three-year period under Article 10.18(1) is not extended by subsequent conduct.  *See* U.S. Submission ¶ 6.  As the United States explained, Article 10.18(1)'s three-year "period is a clear and rigid requirement that is not subject to any suspension, prolongation, or other qualification."  *Id.* ¶ 6 (internal quotation marks omitted). Thus, "subsequent transgressions by a Party arising from a continuing course of conduct do not renew the limitations period."  *Id.*

The 2013 Decision and the 2014 and 2017 Decrees can only be viewed as "subsequent transgressions ... arising from a continuing course of conduct" – namely, the failure to make payment on the Bonos.  *See id.*  The 2013 Decision and the 2014 and 2017 Decrees cannot be untethered from the underlying default on the Bonos that occurred in 1987.  Had Peru never defaulted on the Bonos (which matured in or around 2002), the 2013 Decision and the 2014 and 2017 Decrees would never have been issued.  Dissent ¶ 36; Award ¶ 202.  Peru's default in 1987 set off decades of domestic litigation and governmental actions.  In 1991, Peru's President issued the 1991 Decree, which provided a methodology for paying the Bonos.  Award ¶ 123.  In 1992, the paying agent for the Bonos was terminated.  *Id.* ¶ 122.  In 1996, Peru's legislature abrogated the 1991 Decree and provided a new method for paying the Bonos.  That legislation was then annulled and ruled unconstitutional by the 2001 Decision.  *Id.* ¶¶ 124-25.  Over the following decade, Peru's legislature considered at least nine different draft bills to address payment of the Bonos.  *Id.* ¶¶ 130, 133.  Meanwhile, Peruvian bondholders were pursuing domestic litigations in Peruvian courts – some of which Petitioners themselves admittedly took over.  Award ¶¶ 124-25, 419; Dissent ¶¶ 17-19.  The 2013 Decision was the product of one of these domestic Peruvian litigations, which in turn resulted in the 2014 and 2017 Decrees.  The 2013 Decision and the resulting Decrees were merely the latest volley in the decades-long battle over how to make

payment on the Bonos.  *See* Dissent ¶¶ 29-35.  These subsequent acts in the long and continuous chain of events following Peru's default in 1987 did not restart the three-year period under Article 10.18(1) and do not bring Petitioners' claims.

Furthermore, Petitioners' argument focuses solely on Peru's alleged breaches of the TPA. But Article 10.18(1) requires an examination of both the alleged breach and the resulting injury. The 2013 Decision and the 2014 and 2017 Decrees did not result in any injury distinct from the injury caused by Peru's default in 1987.  While Petitioners asserted that the Decrees "made the Bonos worthless," it is undisputed that the Bonos have been worthless since Peru defaulted in 1987.  Award ¶ 536.  Indeed, Petitioners themselves have repeatedly acknowledged that the Bonos were worthless before they acquired them.  Petitioners' 2006 Memorandum acknowledged that the Bonos were in default and were worthless.  Dissent ¶ 9.  Petitioners' own C.E.O. testified in the arbitration that the Bonos were worthless when Petitioner acquired them. *Id.* ¶¶ 13-17.  The Majority of the Tribunal found that the Bonos were rendered worthless in the 1980s.  Award ¶¶ 120-21.  The Dissent agreed and concluded that any losses on the Bonos were sustained when Peru defaulted in 1987.  Dissent ¶¶ 36-37, 41.  Because the Bonos were already worthless decades before the commencement of the arbitration (not to mention decades before the TPA entered into force), Petitioners cannot satisfy the requirements of Article 10.18(1) and therefore Peru did not consent to arbitrate with Petitioners.

Petitioners similarly cannot satisfy the requirements of Article 10.16(1), which provides for arbitration of investment disputes.  As explained in the U.S. Submission, the United States and Peru have only consented to arbitration under the TPA where the requirements of Article 10.16 are satisfied.  *See* U.S. Submission ¶ 3.  As the United States also explained, Article 10.16(1) contains an express causation requirement.  *Id.* ¶¶ 58-59.  However, for the reasons

discussed above, the 2013 Decision and the 2014 and 2017 Decrees did not cause any loss distinct from the injury resulting from Peru's default on the Bonos in 1987.  *See supra* at pp. 12-13.  While the Majority did not address the causation requirement of Article 10.16(1), the Dissent concluded that the 2013 Decision and the 2014 and 2017 Decrees did not cause any injury to Petitioners and that any loss was suffered as a result of Peru's default in 1987.  Dissent ¶¶ 36-37, 41.  Because Petitioners cannot satisfy the causation requirement of Article 10.16(1), Peru did not consent to arbitrate and no agreement to arbitrate was formed.[8]

Finally, Petitioners rely on *Schneider* for the proposition that a State consents to arbitration by signing an investment treaty containing an arbitration clause.  Pet. ¶ 27 (citing *Schneider*, 688 F.3d at 71).  *Schneider* offers no guidance here as the existence of an arbitration agreement was undisputed.  *See* 688 F.3d at 71.  To be sure, courts in other cases have found that an arbitration agreement was formed where an investor accepted a standing offer to arbitrate contained in a bilateral investment treaty.  *See, e.g.*, *BG Grp. plc v. Republic of Arg.*, 572 U.S. 25 (2014).  However, other cases interpreting completely different language in other different investment treaties do not resolve the question of whether Peru consented to arbitration here.  Indeed, each treaty must be construed on its own terms.  *See Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999) ("the State's argument that similar language in two Treaties involving different parties has precisely the same meaning reveals a fundamental misunderstanding of basic principles of treaty

---

[8] Petitioners argued that the Decrees reduced the value of their Bonos from $1.8 billion to $33.57 million – but Petitioners only paid approximately $33.2 million for the Bonos.  Award ¶¶ 136, 1205.  Thus, Petitioners' own position suggests that, if the Bonos had any value at all, the Bonos were worth more than what Petitioners paid for them following the 2017 Decrees.

construction"). Here, as explained above, the United States and Peru carefully negotiated and drafted detailed terms laying out the conditions of their consent to arbitrate under the TPA. Both the United States and Peru share the understanding that they cannot be deemed to have consented to arbitration unless the express requirements and limitations on their consent to arbitration are satisfied. As explained above, Petitioners have not satisfied those conditions and requirements and therefore no agreement to arbitrate was ever formed.[9]

## CONCLUSION

For the foregoing reasons, this Court should deny the Petition and decline to enforce the Award.[10]

---

[9] This case is also distinguishable from *Stileks* and *Chervon*. The existence of an arbitration agreement was undisputed in those cases, and, instead, the question presented was whether the claimants had made an "investment" as defined in the applicable investment treaties. *See Stileks*, 985 F.3d at 878; *Chervon*, 795 F.3d at 206. Here, by contrast, the question is whether Petitioners satisfied the explicit consent requirements of the TPA and thus whether any arbitration agreement exists at all.

[10] For the avoidance of doubt, Peru objects to Petitioners' requests for post-judgment to accrue at a rate of 7.22% and for attorneys' fees. Judgments entered on arbitral awards, like any other federal judgment, accrue post-judgment interest at the federal statutory rate set forth in 28 U.S.C. § 1961. Section 1961 applies even if the arbitral award provides for a different interest rate to apply until the date of payment. *See Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 457-59 (5th Cir. 2013); *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004); *see also Perenco Ecuador Ltd. v. Republic of Ecuador*, Civ. No. 1:19-cv-2943 (JMC), 2023 U.S. Dist. LEXIS 44022, at *21-23 (D.D.C. Mar. 16, 2023); *Tenaris, S.A. v. Bolivarian Republic of Venezuela*, Civ. No. 1:18-cv-01373 (CJN), 2021 U.S. Dist. LEXIS 59126, at *5-7 (D.D.C. Mar. 29, 2021); *OI European Group B.V. v. Bolivarian Republic of Venezuela*, Civ. No. 16-1533 (ABJ), 2019 U.S. Dist. LEXIS 85128, at *18-22 (D.D.C. May 21, 2019). The Petition offers no basis for awarding attorneys' fees and none exists. *See, e.g., Tenaris*, 2021 U.S. Dist. LEXIS 59126, at *8.

Dated: Washington, D.C.
      April 10, 2024

Respectfully submitted,

CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP

By:   _s/ Kevin A. Meehan_    

Kevin A. Meehan (D.C. Bar No. 1613059)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 452-7373
Fax: (202) 452-7333
Email: kmeehan@curtis.com

*Attorneys for Respondent*
*The Republic of Peru*